The next case this morning is number 520050045 people versus chance arguing for the appellant Patricia chance is Nathan Swanson, arguing for the appellate people of the state of Illinois is Trent Marshall. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, gentlemen. Are you prepared to proceed? Mr. Swanson, you may proceed. Thank you, Your Honor. May it please the court, counsel. Patricia chance was convicted following a stipulated bench trial, one count of aggravated driving under the influence resulting in a death and one count of reckless homicide involving a motor vehicle. Following her conviction, the lesser offense of reckless homicide involving a motor vehicle was merged under the one act one crime doctrine with the aggravated driving of the influence charge and vacated appellant challenges on appeal, the trial court's denial of her motion to suppress the results of her blood draws. Jumping ahead slightly with regards to the second blood draw, the argument is simply that because of the failure to properly provide her with the written tickets, that that blood draws admissible. The bulk of the argument, however, revolves around the circumstances of the first blood draw. The initial question with regard to the first blood draw is, because it's really not all debatable that a blood draw is a governmental search and therefore implicates the Fourth Amendment is under what authority did that first blood drop occur? It was not consensual blood drop. The evidence was inarguable that Miss chance was directed that there would be drawing her blood and she submitted to that directive. It was not pursuant to a search warrant that search warrant was not acquired until after the first blood draw and did not reference or did not apply to it. And because the officer did not read her the warning to motorist, it was not pursuant to the Illinois implied consent law. The only other basis advanced for the lawfulness of the first blood draw was under section 11 dash 501.2 c two, which holds that under when a person is under arrest for probable cause for driving under the influence resulting and there's been an accident resulting in injury or death, the officer shall request and the driver shall provide a blood draw. I'm sorry, a blood draw. I would point out as noted in the in people the eubanks, which is cited in the briefs in footnote one of that a bit of legislative history. Prior to 2011, that statute read slightly differently. It simply read that regardless of one's ability to refuse under the rest of the implied consent statute, that the driver shall shall provide a sample in the middle of the statute. In 2011, the legislature amended it to say, regardless of the ability to withdraw their consent to refuse, the officer shall request and the person shall provide a blood draw. This would indicate there's a clear legislative mandate that the officer can't simply say go to a blood draw, they have to make the request. The case law of is also clear that if there is a refusal, even though the statute mandates compliance, the officer cannot forcibly initiate the blood draw. Is it forcibly or physically forcibly, physically forcibly, Your Honor, so physically restrain and remove it against resistance, which that's not an issue here. I think the pertinent point of that addition, though, is the officer had to make a request. And I think the record is clear here that prior to the first blood draw, there was never a request to make. Well, wait a minute. Now. We are, I think, presuming that the nurse who took the draw was acting as an agent and instrumental instrumentality of law enforcement. That's correct. Yes, Your Honor. I think that's what we are presuming that. But I also think the record bears that out. The tension. Okay, she came. Okay, she came. She came into the room where the defendant was seated. There was no police officer there. I think there was a police officer outside the door. But the nurse came in and said, I came in to basically take your blood. Is there any way you could interpret this as a request by an agent of law enforcement? I think under the totality of the circumstances, you couldn't arrive at that conclusion, Your Honor. My, my recollection of the record is that law enforcement transported in this to the hospital, told her we are going for to take your blood. They arrived there, the officer escorted Ms. Jantz into the hospital, told the nurses, I'm going to need a blood draw, left left the hospital to get a, get some paperwork, including the implied, the morning warning to motorist. And during his absence from the hospital, I'm not sure if he was outside the door or outside the hospital. But while he was gone, that's when the under those facts, I don't think there's really any argument that this was a private blood draw. But for the officer, bringing Ms. Jantz there and telling the nurse to that he was going to need a blood draw, this wouldn't have occurred. Okay, what about the fact that the drug drug was obviously in excess of the direction of the officer, suppose the officer said, Well, you know, don't do it. Now I'm going back to get my paperwork. And then the, the agent, in violation of the direction proceeded to take the blood draw. Does that does that matter? Since there's really no allegation of improper conduct on the part of the, of the officer? Well, I don't think that that would make a difference under this circumstance, just because the ultimate and the ultimate issue that I don't think there's really an argument about, but for the officer's direction, it wouldn't have occurred. You be in a different counterfactual world, but we don't, but we don't know what that world would look like. We don't know if the officer would have read the morning to motorist or not, or what would have happened under those circumstances. But we do know that the nurse was acting at on the basis of the law officer statement, I'm going to need a blood draw. Or we can at least conclude that beyond a deal. The issue here is essentially does 11501.1 C2 basically function as a standalone authorization for in any circumstance, the officers can direct a blood draw without a request without a search warrant without any exigency and get one. And the problem with that interpretation of 501.1 C2 is that is precisely what the Supreme Court said in people be you banks would not be appropriate, that they in new banks, the Supreme Court held that 501.1 C2 was a codified exigency that pursuant to Schmerber and not Schmerber, but Missouri versus McNeely in this case is Mitchell. And that but it did note that it's not that broad, it doesn't apply to all of those circumstances. This essentially is a certain, you know, to look at that particular event, this is that circumstance that in eubanks, the Supreme Court said, that would not be okay. Once the blood draw was completed, the officer did read the applied consent requested a blood draw that was denied. At that point, he went and got a search warrant. He now we don't know, again, talking about counterfactuals, we don't know if he had the officer after having properly read the implied consent. And I will also point out the case law is clear that 501.1 C2 has been interpreted as part and partial of the entire 501 series, the entirety of the implied consent and driving under the influence, we don't read it by itself, we read it as part of that whole body of law. So had he requested one at that point, or had he made the request, then she denied it, he could have ordered a blood draw then. But then again, that's not what happened. He then went and got a search warrant. As the state correctly notes, in their response brief, the question is now was there an exigency present beyond just the normal codified exigency of the statute. And I think the facts are that there was not the at the accident occurred around seven o'clock, the first blood draw occurs at 750, the implied consent is read and denied at 830. And within two and a half hours, the search warrant has been obtained and the second blood draws occurred. There was no exigency in effect here that would have precluded the request for a warrant. What it boils down to is that very first blood draw doesn't happen under the aegis of any exigency, doesn't happen in the search warrant and doesn't happen under the implied consent or following the procedures thereof as required by the legislature. So the trial court erred in denying the motion to suppress on that point. The ultimate effect of this is such that misses or mischances convictions should be overturned. The stipulated bench trial was based in large, she was found guilty of the driving while intoxicated and reckless. Both of those were charged at least in part based on her intoxication. Without the first blood draw, the retrograde extrapolation, even if you assume the second blood draw is admissible, the retrograde extrapolation of what her blood alcohol content would have been at the time of the accident, that wouldn't have been possible and it wouldn't have been admissible and without that fact, the conviction can't stand. And if there aren't any questions and I'm right at my time. Any questions, Justice Moore? Well, let's assume that you're right as to the first blood draw. You're not contesting the search warrant, are you? No, sir. And what about the evidence remaining, even if you throw out the first blood draw? Is that enough to sustain the conviction? And we would argue that it's not, Your Honor, that especially considering that a substantial portion of the state's evidence was that retrograde extrapolation that because the first blood draw revealed a .15 and the second blood draw revealed a .78, then the assumption would be that her at a time of the accident was higher than the .15 because it would have been decreasing. That without that, whether or not she was under the influence above the legal limit or otherwise, would not be established without a reasonable doubt. Thank you, Justice Welch. No questions. Any further questions, Justice Moore? So what was the second draw? My recollection is without checking my notes was that the second blood draw revealed a .078. And that's only two 100ths off of the legal threshold? Yes, sir. And that was how many hours later? That blood draw occurred at 11, so around three. Okay, thank you. Also, the technician indicated that there was a plus or minus error that might have brought up the .08. Is that correct? That is true. The plus or minus error also might have brought it below. And the other pertinent point is, with regard to the retrograde extrapolation, is that without the first blood draw, whether or not her blood alcohol was rising or falling, and therefore what her blood alcohol would have been at the time of driving couldn't be established. With a single data point, we don't know where it would have been three hours beforehand. With the two data points, they can make an extrapolation there. Okay, any other questions? No questions. Mr. Marshall, in all fairness, I'm going to give you three additional minutes. Thank you, Your Honor. You may proceed. Thank you, sir. State would first note that the defendant's arguments regarding the applicability of Eubanks are raised for the first time in his reply brief. So to the extent that this court would appropriate, state would ask that those arguments be found waived pursuant to Supreme Court Rule 341 H7. That said, the state's primary position with respect to the first blood draw is that between Jones, Harrison, and Eubanks, C-2 has always been constitutional, facially constitutional when applied in cases involving death or serious injury. In April 2016, Officer Trooper Scruggs could reason relied on Harrison, and Eubanks later confirmed that that reliance was sound. A fair reading of Eubanks and state's reading of it is that the police can, as a matter of course, always rely on Section C-2 in cases involving death or serious injury so long as they don't do so lazily or so long as the facts demonstrate that they acted with the expected urgency under the circumstances. Defendant suggests in his reply brief that nothing suggests that a warrant could not have been obtained, but I don't believe that that's the proper focus. It's not what the police could have hypothetically have done. It's how they actually proceeded and used their time, and if they use their time in a manner that undermines the very purpose of C-2, then they can't rely on it, and these facts are nothing like the facts in Eubanks. These facts, I submit, present the exact kind of scenario that Eubanks indicated allows for a reasonable reliance on C-2. Now, as for, Justice Wharton had picked up on this, as for the defendant's argument that there had to be a specific request before C-2 is triggered. I'm not sure that's the case, and if it was, the state would argue that the nurse who was present was acting as an agent, and although she directed it, instead of saying, may I please have your blood, it was still a circumstance that fell under C-2, if it was required. Now, with respect to the second blood draw, the first one should have been suppressed. The warrant was supported by probable cause. It revealed .0786 hours after the represented that those results were extrapolated to reveal the BAC was .188 at the time of the crash. The defendant's reply brief, she maintains that the first draw was the basis for the extrapolation. In my reading of page C-169 of the record, which is a relevant portion, I'd submit that both statements are accurate. It appears that both were used in the extrapolation data to obtain this extrapolation data. I'm not sure if one was dependent on the other, or if they could have been independently obtained, to the extent that that is an ambiguity, the state would ask it to be resolved against the appellant. And on that, I would add that even assuming that the extrapolation evidence was based solely on the first draw, and that the only evidence that was properly garnered from the second was that she had a BAC of .0786 hours after, the trial court still could have properly considered that as additional evidence of impairment pursuant to 511.501.2B2. I acknowledge that I cite that, that's not in the brief, in the state's brief, but I did not realize, or I didn't catch the possible ambiguity with respect to the retrograde extrapolation until I read Mr. Swanson's reply brief. State's final point, I guess, would be that even assuming the trial court should not have considered any of the BAC evidence from either draw, the remaining evidence indicating the defendant was under the influence of alcohol at the time of the crash, summarized at the state's brief on pages 15 and 16, was sufficient to support the trial court's finding of guilt. And if there are any questions, I would just respectfully request that the trial court's judgment be affirmed. I have a question. Okay, it was clear in Eubanks where the law enforcement officers waited so long until I think the blood alcohol content was zero and the court found that the failure to act expeditiously indicated that there was no exigent circumstances. Are you saying that if the officers act expeditiously, that that is an indication of exigent circumstances? Or that's that way? I think Eubanks can fairly be read as holding that, sir. Yes. Because in Eubanks, it was almost like well, first of all, they arrested him. They waited hours and hours, I think, before they interviewed him. They might have smelled alcohol. I think the evidence was he took a nap in between. They came back later, asked him to do a draw. He refused. And then they brought him to the hospital and got one forcibly. And then they were coming back later saying we should be able to rely on C2 given the exigent circumstances presented by a wreck and the dissipation of BAC. And the court was like, it was disingenuous because they're like, you didn't act with any exigency at all with that. You waited and waited. We're not going to allow you to rely on the statute. Thank you. You're welcome. And I would note, I checked last night, the relevant head note from Eubanks 11, no subsequent treatment since then. But I feel fairly confident in our the state's recitation that as long as the police act with the expected urgency under the circumstances, then they can reasonably rely on the statute. Thank you, Justice Moore. No questions. Justice Welch. No question. Mr. Swanson. I think you're very briefly with regards to the extrapolation. I would actually move this. I think it's if I, if I implied that the retrograde extrapolation was based solely on the first blood draw, then I, that was not my intention. My read of it is that the retrograde extrapolation was both, was based on both blood draws, which would suggest that if one of them was not present, the retrograde extrapolation could have been achieved, but that's that you need both data points. You need the first blood draw given a result early, the second blood draw given a result later. And from that, you can plot it out of the graph and figure out what the BAC was. So without one, you can't do it. The line might go up, the line might go down and you don't know. What's the basis for that argument? Why can't you? That is my understanding. I should say that's my understanding of retrograde extrapolation and what that means. But I don't have the citation right in front of me, Your Honor, so I apologize. With regards to Eubanks, I guess the difference I would have with the state is that in Eubanks, and I'll quote it briefly, it's the Supreme Court said that, or that if you read 11501C2, 5.1.1C2 in isolation, it would suggest that a warrant is unnecessary in all cases in which the police have a probable cause to believe a person is driven or been in an actual physical patrol vehicle under the influence of drugs or alcohol and has caused a death or injury. However, under the United States Supreme Court case law, the general rule will not apply in those unusual cases in which the blood draws solely for law enforcement purposes and the police could not reasonably judge that a warrant application would interfere with other pressing needs or duties. So we may differ about, you know, I understand that in Eubanks have the circumstances of that was they were dilly-dallying and going along. But in this case, there is no, the officers had no basis to conclude that they couldn't have gotten a warrant. So under that basis, I would argue that Eubanks, that unusual case situation that would apply here, the officers were able to once the issue came up. And without any other questions, I yield the rest of my time. Justice Moore. No other questions. Justice Welch. No more. Thank you, gentlemen. We'll take this on advisement and the decision will be following.